demand the return of the diamond ring," holding the memorandum in his hand at the time, and the defendant said, "All right, I accept your demand." Behrens testified that that was all that was said. "He did not give me my ring." In the meantime, and after the $5 was paid and the $25 check given, the defendant claims that he discovered that the diamond in the ring was not of the quality represented by Behrens when he sold it, and that thereupon he (the defendant) stopped the payment of the check. When the return of the ring was demanded by Behrens the defendant said, "All right, I accept your demand." He did not refuse, therefore, to give up the ring. He swore that he stated that he would give it up upon the $5 and the $25 check being returned. That is denied, it is true, by Behrens and his son; but criminal intent cannot necessarily be inferred from his mere neglect to return the ring. It had come into his possession lawfully, and Behrens expressly agreed that, if the defendant made default in any of the deposits, he (Behrens) "may deliver to the first party articles, as near as may be, of the same nature, manufacture and style as the chattels herein agreed to be delivered but reasonably worth the sums so deposited." This stipulation cannot be regarded as leaving it altogether optional with Behrens whether he would deliver to the defendant merchandise of the value of $5 or of $25; but, at all events, the defendant might be justified in believing that before the ring was returned by him he was entitled to something as an equivalent for the money he had paid on account of the transaction. He might well have believed that before the return of the ring could be exacted or compelled Behrens ought to satisfy him in some way for the money paid on account. There is nothing in this evidence to indicate an original purpose on the part of the defendant to procure possession of the ring by fraud, artifice, or deception, and its conversion subsequently with a felonious intent is not satisfactorily established.

I think the judgment should be reversed and a new trial ordered.

HOUGHTON, J., concurs.

---

(52 Misc. Rep. 46)

WEBB v. FORTY–SECOND ST., MANHATTANVILLE & ST. NICHOLAS AVE. RY. CO.*

(Superior Court of City of New York.  February, 1881.)

1. STREET RAILROADS—ORGANIZATION.

Laws 1860, p. 16, c. 10, § 1, provides that it shall not be lawful to lay or operate a railroad on any of the streets in the city of New York except under the regulations and restriction which the Legislature may thereafter provide. *Held*, that after the passage of such act a corporation could not be organized under the general railroad law of 1850, and its amendments to operate a street railroad in the city of New York, nor could it be formed under that law without specifying in its articles the route of its projected road.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Street Railroads, § 22.]

---

*Published by request.

**2. SAME—VALIDATION OF ORGANIZATION.**

Where, after the passage of Laws 1860, p. 16, § 10, relating to the incorporation of street railroads, an attempt was made to organize under the general railroad law of 1850, such organization could not be validated, nor could the corporation acquire a franchise to build a street railway in New York by an assignment to the corporation of a franchise given by Laws 1873, p. 1238, c. 825, nor could such railroad alter or change its route; the franchise being in the hands of the assignee subject to all the restrictions imposed on it by the act which granted it.

**3. SAME—ALTERATION OF ROUTE.**

A change or alteration of route of a street railway is only permitted by general railroad law 1850 for the improvement of the lines, and not to extend it for the purpose of increasing revenues or to change its direction.

**4. SAME—EXTENSION OF STREET RAILROAD—INJUNCTION.**

An abutting owner can maintain an action to restrain a street railway corporation from constructing an extension of its road in front of his premises on the ground that the corporation has not acquired the right to construct the same.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Street Railroads, § 136.]

Action by William H. Webb against the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway Company to restrain defendant from constructing an extension of its street railway through the street adjacent to plaintiff's premises. Judgment for plaintiff.

Flanagan & Bright (O. E. Bright, of counsel), for plaintiff.

Arthur, Phelps, Knevals & Ransom (Rastus S. Ransom, of counsel), for defendant.

SEDGWICK, J. Assuming that under the general railroad statutes (chapter 140, p. 211, Laws 1850, and the amendments thereof) a company might have been formed before the enactment of chapter 10, p. 16, Laws 1860, for the purpose of constructing, maintaining and operating a railroad for public use in the conveyance of persons and property in the streets of the city of New York, it is certain that after enactment a company could not be formed for such a purpose under the general railroad statutes.

Section 1, c. 10, p. 16, Laws 1860, is:

"It shall not be lawful, hereafter, to lay, construct or operate any railroad in and upon or along any or either of the streets or avenues of the city of New York, wherever such railroad may commence or end, except under the authority and subject to the regulations and restriction which the Legislature may hereafter grant and provide."

If it was thereafter unlawful to lay a railroad in the streets of New York, it could not have been intended that it should thereafter be lawful to form a company for the purpose of doing the thing declared to be thereafter unlawful unless it was thereafter authorized by the Legislature. The intention of the Legislature extended to a withdrawal of a franchise of laying railways in New York city from the operation of the general rules which might be fitted to the circumstances of the rest of the state. It must be kept in mind that it was not the intention of the general railroad act that thereunder a company might be formed for

the general purpose of constructing a railroad or railroads, in general, or at some place or on some route left at the time of the incorporation unspecified, or to be thereafter or otherwise fixed or determined. To make the incorporation (section 1) it was necessary "to make and sign articles of association, in which shall be stated, * * * the places from and to which the road is to be constructed, or maintained and operated, the length of such road as near as may be, and the name of each county," etc. If the association could not specify in their articles the specific things required to be stated in their articles of association, they did not become a corporation. By chapter 10, p. 16, of the Laws of 1860, it became unlawful to construct, without subsequent legislative authority, a railroad in the streets of New York; and that involved subsequent legislative authority to form a corporation to build such a railroad.

This course of reflection does not involve any assertion that under the general railroad acts it was not lawful to form companies with the purpose of constructing railroads on which persons might be conveyed by the power of animals in the streets of other cities than the city of New York. And it is not meant to inquire directly as to the legality of the defendant's incorporation under the general railroad acts any further than is necessary to examine the validity of its action as determined by the lawful scope of its powers. By chapter 825, p. 1238, Laws 1873, certain persons and their assigns were authorized and empowered to construct a railway upon and along specified streets in this city. For the purpose of this action it is sufficient to say that this act did not authorize the construction of a railroad on Forty-Second street, east of Tenth avenue. The terms of the grant are so limited that in them is to be implied the equivalent of an affirmative prohibition against constructing railways elsewhere than in the streets named, or, in other words, against constructing a railway upon Forty-Second street, east of Tenth avenue. The rules for construing grants of public franchises show that there is an implied prohibition. No restriction was described in words, but it existed. The defendant, with all the rest of the world, was forbidden by the general principles of the law of the state, and also by chapter 10, p. 16, Laws 1860, from using the streets of New York except as authorized by the Legislature; and the act of 1873 did not authorize the use of Forty-Second street east of Tenth avenue.

After this act, and such being the prohibition, the gentlemen who signed the articles of association under which the incorporation of defendant is now maintained proceeded to incorporate themselves according to the provisions of the general law of 1850. The articles were filed August 29, 1878. I gather from the testimony that at this time the owners of the franchise of the act of 1873 had not assigned the franchise to their associates, but that the assignment was made after the filing of the articles. In such a predicament what right to the route, so to call it, could the associates, at the time of the filing of the articles, acquire by virtue of the general act? Clearly none. The Legislature had said, not only that a railway in the city of New York should not be constructed under the general law of 1850, but had also made a grant of the particular franchise to the persons named in the act of 1873. If the attempted incorporation did not on the day of the filing of the

articles give the franchise, no other subsequent proceeding or transaction could that was not the equivalent of filing new articles that competently conformed with the statute. "Quod ab initio non valet in tractu temporis non convalescet." If a right to the route was not acquired under the general act, that other part of a franchise which consisted of a right to alter or change the route could not be acquired.

A subsequent assignment of the franchise of the act of 1873 was not the equivalent of obtaining a route under the general act, for the former had a restriction upon it, and the latter had no restriction upon it as to the possibility of changing the route, and which, in contemplation of the law, was grafted upon and modified the character of the route first to be acquired under the general law. For the sake of distinctness it must be kept in mind that the owners of the franchise under the act of 1873 did not own a route as a separate piece of property—e. g., a chattel—or a lot of land which could be separated from their franchise and its obligations and absolutely disposed of. They had the power to assign their franchise, but only as it was, as a franchise in its individuality, with the restrictions against building on other streets than the act specified. They could not assign the route irrespective of the franchise which regulated and restricted the use of the route; and therefore the defendants could not gain by assignment the route freed from the limitations of the franchise. Unless the assignment resulted in bestowing an unrestricted route, the route they did acquire could not be taken from the limitations of the act of 1873 and transferred to the jurisdiction of the general act; for, under that act, the route must be unrestricted as to the power to alter and change it. It may possibly be a mistake to say that the assignment of the franchise of the act of 1873 was made after the date of the filing of the articles of association. I think the date of the transfer unimportant as to the point in view. The objection is to the nature of the transaction.

The franchise of the act of 1873 had a restriction. The general railroad act was intended to give franchises so large that, when fully exercised, they would not be subject to this restriction. The act of 1860 had provided that the general railroad act should not be used for the purpose of acquiring a franchise of the nature of the one granted by the act of 1873. It had, in substance, declared it was not wise or expedient to leave franchises of future railroads in the streets of New York subject only to such regulations as might be suited for the rest of the state. This statute avails nothing if, when a restricted charter is granted by special act, the restriction may be abolished merely by assigning the franchise to a corporation under the act of 1850, which corporation, without the assignment, would not have the right to do the thing forbidden by the special act. A franchise under the act of 1850 would be one thing, and a franchise under the act of 1873 would be another distinct thing. There is no legal way of melting these two together so that they shall become one. And parts cannot be taken from either and annexed to parts taken from the other and a new franchise made thereby.

The fact may be seen more clearly if it is supposed, and it may be this case here, that the persons named by the act of 1873 were to be-

come the incorporation under the act of 1850. It is clearly seen that the act of 1873 might as well have said at once that they could construct a railway in any or all of the streets in New York, provided they could get the sanction of the common council under chapter 140, p. 323, Laws 1854. That the act of 1873 did not intend that the franchise described should be used to gain general rights under the general act may be per- ceived from its ,specifically enacting that the grantees might employ certain parts of the general act for certain purposes. In fine, the franchise of the act of 1873 cannot be freed from its restrictions, in whose- soever hands it may come, until some competent legislative authority `be found that removes the restriction. The general law will not do this, because it was enacted before the law of 1860, and because, con- strued by the effect of the law of 1860, its provisions were not in- tended to regulate a franchise of the kind given by the act of 1873, viz., a franchise to construct a railway in the streets of New York city.

Chapter 77, p. 60, Laws 1876, does not affect the matters that have been examined. That chapter was an amendment to the general railroad act; and the amendment was to be applied to the cases em- braced by that general act, viz., all cases excepting those referred to by chapter 10, p. 16, Laws 1860, or, in other words, all cases excepting railways in the streets of the city of New York. It was not the in- tention to affect the operation of chapter 10, p. 16, Laws 1860. It is a familiar rule of construction "that a special statute providing for a particular case or applicable to a particular locality is not repealed by a statute general in its terms and application unless the intention of the Legislature to repeal or alter the special law is manifest, although the terms of the general act would be taken strictly, and but for the special law include the case or cases provided for by it." Van Denburgh v. Village of Greenbush, 66 N. Y. 3; People v. Brinkerhoff, 68 N. Y. 259; Excelsior Petroleum Co. v. Lacey, 63 N. Y. 422; Ely v. Holton, 15 N. Y. 595; People v. Supervisors, 67 N. Y. 117, 23 Am. Rep. 94; Moore v. Mansert, 49 N. Y. 333. Chapter 825, p. 1238, Laws 1873 did not, of course, repeal any part of the act of 1860. On the contrary, the former had regard to the provisions and restrictions of the latter and gave them practical effect. After the act of 1860 it was not lawful to operate any railroad in the streets of New York, "except under the authority and subject to the restrictions which the Legislature may hereafter grant and provide." The Legislature has not, since 1860, passed. any law which has removed the restrictions of the act of 1873.

I am further of the opinion that the action of the defendants' direc- tion "in changing and altering the route" from its present authorized tracks in Forty-Second street, with double tracks to and through the tun- nel in "Forty-Second street, * * * so that one of its terminals shall be at the East river, was not authorized by the intent of section 23, of the general railroad act." That section declares that the directors of every company formed under the act may, by a vote of two-thirds of their whole number, at any time alter or change the route, if it shall appear to them that "the line can be improved thereby." This con- templates (People ex rel. Erie & G. V. R. R. Co. v. Tubbs, 49 N. Y. 356) that the object and limits of the change and alterations of the

route and termini shall be an improvement of the line theretofore established. The context in the act shows that "line" means the same as "route." By line is not meant the organization or the several particulars taken together, which, when used for the active affairs of the company, might colloquially be termed the line. But it is that specific thing which, taken by itself even before the company goes into active operation, is called its line or its route. It is the direction which the rails are to take, or which they may have taken, and also the situation of the various structures connected with the rails in their relation in place to the latter. It is not a mere prolongation of the line, unless such prolongation improves the direction of that part of the railway that has already been projected or constructed. It is not, of course, a prolongation for the purpose of increasing the revenue of the company, because of the increased distance over which the cars may be run. That extension may not have any relation to an improvement of the former direction of the line. It may not change the direction at all. In the present case the alteration or the adoption of the new terminus does not appear (Barrett v. Third Ave. R. R. Co., 45 N. Y. 628) to be connected with any improvement of the line that existed before the resolutions of the directors. The extension has not changed the old line. All of the old line is where it was before. Conceive that the alterations comprised the building, with the sanction and consent of the common council and property owners, the road not only east through Forty-Second street to the ferry, but then southerly to the Battery, with branches to the various ferries, such an alteration could not be deemed an improvement of the line within the meaning of the twenty-third section. The length of the alteration would make it clear that at some point it went beyond the possibility of being an improvement, but a reduction of that length to the present proposed extension would not adduce any evidence of its being an improvement of the kind required. The present proposed alteration is an enlargement of the franchise. It is a new substantive franchise. It is not incidental to or accessorial to the old franchise, as an improvement of the line or direction of the railway would be. I do not intimate that the directors may not exercise their judgment and discretion as to the character of the alteration, provided that judgment and discretion is confined to what is in the nature of an improvement of the line or route. I have therefore come to the conclusion that the defendants have no legal authority to build a railway in Forty-Second street, east of Tenth avenue.

It appears to me that the plaintiff would be so specially affected by the operations of the railroad along the side of his house that he may maintain this action. It must be seen that the condition of the street would be materially changed by the noise of the horse cars and the accompanying incidents of a street railway. The result of the road being built upon the south part of the street would, in all seasons, but especially in winter, burden the north part with much more travel and traffic than if the street were not incumbered with the rails and cars. This would specially affect the comfort and convenience of the occupants of plaintiff's house. It would make the house less accessible. The house would be less desirable as a house for families. The im-

mediate evils seem to be certain. That compensatory benefits will thereafter arise seems to be the opinion of intelligent gentlemen who were witnesses. It is no impeachment of their sagacity to see that what rests upon opinion as to the future, and future contingencies, will not prevent the former evils, even if it will afford compensation after the injury has been done. Probably a court has no right to rest upon so slender a support as an opinion as to events in a remote future furnishes.

It is objected that this court has no jurisdiction of this action, because it is provided by section 3, c. 825, p. 1239, Laws 1873, "that actions or proceedings in law relating to, affecting or arising under this act or the authority hereby given, shall be commenced in the Supreme Court of the First Judicial District." I do not perceive that this action has regard to anything under the act of 1873, as even claimed by defendants. They make a claim under the general railroad act to be incapacitated thereby, and thereupon to gain a right to alter a route that they have under that act. It is that claim which this action affects, and the question is, when the full claim as to the operation of the act of 1873 is admitted, whether the court cannot proceed to adjudge whether they also acquired a right under the general railroad act.

The plaintiff's proposed findings have been handed up, but I shall not pass upon them until the defendant's proposed findings shall also be handed up.

The plaintiff should have judgment, with costs.